**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
      *Plaintiff-Appellee,*

    v.

MICHAEL KRANOVICH,
      *Defendant-Appellant.*

No. 03-10226

D.C. No.
CR-02-00138-ECR

OPINION

Appeal from the United States District Court
for the District of Nevada
Edward C. Reed, Jr., District Judge, Presiding

Argued and Submitted
January 16, 2004—San Francisco, California

Filed March 23, 2005

Before: J. Clifford Wallace and M. Margaret McKeown,
Circuit Judges, and Barry Ted Moskowitz, District Judge.*

Opinion by Judge Wallace

*The Honorable Barry Ted Moskowitz, District Judge for the Southern District of California, sitting by designation.

## COUNSEL

Fred Atcheson, Reno, Nevada, for the defendant-appellant.

Ronald C. Rachow, Assistant United States Attorney, Reno, Nevada, for the plaintiff-appellee.

## OPINION

WALLACE, Circuit Judge:

Former Lander County Sheriff Kranovich appeals from his judgment of conviction and sentence for theft involving a federally funded program, in violation of 18 U.S.C. § 666(a)(1), and theft of government property, in violation of 18 U.S.C. § 641. He attacks his section 666 conviction by arguing that there was insufficient evidence that there was a connection between the wrongfully expended funds and either the expenditure of federal funds or the integrity of federal programs, and that Lander County received a federal benefit in excess of $10,000. He challenges his section 641 conviction by contending there was insufficient evidence that the embezzled funds were property of the United States. The district court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction over this timely appeal pursuant to 18 U.S.C. §§ 1291 and 3742, and we affirm the judgment of conviction.[1]

I.

While Kranovich was the elected Sheriff of Lander County (County), Nevada, the Sheriff's Department entered into a Federal Equitable Sharing Agreement (Agreement) with the federal government. The Agreement enrolled the Sheriff's Department in a federal equitable sharing program (Program) — a venture between local law enforcement agencies and the federal Departments of Justice and Treasury that provided for the equitable sharing of cash, property, and other forfeited assets. In order to receive Program funds, the Sheriff's Department had to abide by numerous restrictions set forth in the Agreement, including the following:

---

[1]Kranovich also contests the district court's application of a sentence enhancement, pursuant to U.S.S.G. § 3C1.1, for obstruction of justice. We will address his sentencing challenge in a separate memorandum disposition.

Uses. Any shared asset shall be used for law enforcement purposes in accordance with the statutes and guidelines that govern equitable sharing . . . . Any and all requests for a change in the use of cash, property, or proceeds . . . must be submitted in writing to [the relevant agencies of the Departments of Justice and the Treasury].

. . . .

Internal controls. The parties agree to account separately for federal equitable sharing funds received from the Department of Justice and the Department of the Treasury. Funds from state and local forfeitures and other sources must not be deposited or otherwise commingled with equitable sharing funds. . . .

. . . [S]uch accounting will be subject to the standard accounting requirements and practices employed for other such public monies as supplemented by requirements set forth in the current edition of [guides published by the Departments of Justice and the Treasury]. . . .

The misuse or misapplication of shared resources or the supplantation of existing resources with shared assets is prohibited. Failure to comply with any provision of this agreement shall subject the recipient agency to . . . sanctions stipulated in the current [Justice or Treasury guides] . . . .

Federal Annual Certification Report. The recipient agency shall submit an Annual Certification Report to the Department of Justice and the Department of the Treasury . . . . *Receipt of the certification report is a prerequisite to receiving any equitably shared cash, property, or proceeds.*

Audit Report. Audits will be conducted as provided by [certain federal provisions].

As required by the Agreement, Kranovich filed annual accountings of these funds with the United States government. Lander County Undersheriff Lutzow testified that the funds were to be used "generally towards narcotics enforcement or prevention [and] could not be used to augment a county or local budget." He also testified that the funds were to be returned to the federal government if they could not be utilized for appropriate purposes.

From approximately July 2001 to January 2002, Kranovich used checks requiring dual signatures to withdraw funds from the Program account. He cashed the checks and kept the funds in a locked box to which only he had access. Trial testimony established that during that six-month period, the account was drawn down from approximately $20,600 to about $5,000. An audit by the County finance director in January 2002 revealed there was only about $400 in the cash box and more than $15,000 was missing from the account.

On July 24, 2002, following an investigation by the Federal Bureau of Investigation, Kranovich was indicted and charged with theft concerning programs receiving federal funds, in violation of 18 U.S.C. § 666, and theft of government property, in violation of 18 U.S.C. § 641.

Section 666, however, was applicable only if the Sheriff's Department or the County had received, in any one year period, benefits in excess of $10,000 under a federal program involving some form of federal assistance. To satisfy this requirement, the government introduced evidence that during the year of July of 2001 to July of 2002, the County was approved for a federal grant of $12,775. This grant was not connected to the Program. The grant funds were to be used to reimburse fifty percent of the amount spent by law enforcement officers to purchase bulletproof vests. Kranovich alleges

that the grant was conditioned on the availability of funds, but Patrol Sergeant Quick — the author of the grant application — testified that the grant amount was guaranteed and could be spent at any time after the funds became available on June 2, 2002, provided they were spent within four years. Quick also testified that approximately $1,200 of the total grant amount was actually claimed and received by the County.

After a jury found Kranovich guilty of both offenses, he filed a motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c), which the district court denied. *United States v. Kranovich*, 244 F. Supp. 2d 1109 (D. Nev. 2003).

## II.

Kranovich argues that a connection between the embezzled money and either an expenditure of federal funds or the integrity of a federal program is required for a conviction under 18 U.S.C. § 666. We review de novo the construction or interpretation of a statute, *United States v. Cabaccang*, 332 F.3d 622, 624-25 (9th Cir. 2003) (en banc), as well as questions regarding the constitutionality of a statute. *United States v. Bynum*, 327 F.3d 986, 990 (9th Cir. 2003).

**[1]** Section 666(a) provides for the imposition of criminal penalties against any agent of a state government who embezzles property "valued at $5,000 or more" that "is owned by, or under the care, custody, or control of" that government, provided that the requirements of section 666(b) are satisfied. 18 U.S.C. § 666(a)(1)(A). Section 666(b) requires that such government have received, in any one year period, federal benefits in excess of $10,000. *Id.* § 666(b). Although the express language of section 666 does not require any other connection between the embezzled funds and a federal interest or program, Kranovich contends such a nexus is a constitutionally required element of this offense. He argues that without a nexus, the "nature of the crime is inherently local

and the application of federal jurisdiction violates the spending clause of the constitution."

[2] This argument is foreclosed by recent precedent, as Kranovich properly concedes in his supplemental brief. In *Sabri v. United States*, 541 U.S. 600, 124 S. Ct. 1941 (2004), the Supreme Court rejected a facial challenge to 18 U.S.C. § 666, stating:

> We can readily dispose of this position that, to qualify as a valid exercise of Article I power, the statute must require proof of connection with federal money as an element of the offense. We simply do not presume the unconstitutionality of federal criminal statutes lacking explicit provision of a jurisdictional hook, and there is no occasion even to consider the need for such a requirement where there is no reason to suspect that enforcement of a criminal statute would extend beyond a legitimate interest cognizable under Article I, § 8. . . . It is certainly enough that the statutes condition the offense on a threshold amount of federal dollars defining the federal interest, such as that provided here . . . .

*Id.* at 1945-46. In *United States v. Mirikitani*, 380 F.3d 1223, 1225 (9th Cir. 2004), we stated that "the Supreme Court [in *Sabri*] not only held that a federal nexus was not an element of the crime, but it held that no federal nexus must be shown at all." We rejected Mirikitani's claim that the existence of a nexus was required to be proven to a jury: "Because the government is not required to establish a federal nexus, the district court did not err by not submitting to the jury the question of whether a federal nexus existed." *Id. Sabri* and *Mirikitani* are controlling here, and we therefore hold the government was not required to establish any connection between the embezzled funds and a federal interest, apart from the express requirement in section 666(b) that the County received federal benefits in excess of $10,000.

III.

Thus, we turn to Kranovich's next section 666 argument that the government introduced insufficient evidence that the County received a federal benefit in excess of $10,000. We review claims of insufficient evidence de novo. *United States v. Odom*, 329 F.3d 1032, 1034 (9th Cir. 2003). "Evidence is sufficient if, viewed in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*

Section 666(a) makes it a federal offense to embezzle funds from an organization which, as set forth in section 666(b), "receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant . . . or other form of Federal assistance." 18 U.S.C. § 666(a)-(b). To satisfy this requirement, the government relied on evidence that in May of 2002, the County had been approved for, and therefore "received," a $12,775 grant to be used to reimburse officers who purchased bulletproof vests. Sergeant Quick testified that he submitted the papers necessary for the grant, received an e-mail response that the County had been approved for a grant of $12,775, and that this amount was guaranteed. He also stated that the funds became available after June 2, 2002 and could be spent at any time within a four year period, although the County had not yet spent more than about $1,200.

Kranovich makes two arguments as to why the government's evidence was insufficient. First, he asserts that the total grant amount was not "received" by the County because less than $1,300 was actually transferred from the federal government. He suggests the County did not "receive" the remaining funds because they were "always in the federal government's possession and [were] never placed into a bank account controlled by Lander County."

[3] However, there is no reason to distinguish between access to funds in a County bank account and access to guar-

anteed grant funds that are available upon request. As a result of the grant, the County essentially had access to a $12,775 line of credit. The statute simply requires that the "benefits" be "received." In fact, once the grant was awarded, the County "received" the "benefits" of the grant. At most, the government was simply holding the funds for the benefit of the County.

In addition, the Supreme Court has recognized that section 666(b) should be interpreted broadly because its "language indicates that Congress viewed many federal assistance programs as providing benefits to participating organizations. Coupled with the broad substantive prohibitions of subsection (a), the language of subsection (b) reveals Congress' expansive, unambiguous intent to ensure the integrity of organizations participating in federal assistance programs." *Fischer v. United States*, 529 U.S. 667, 678 (2000).

Second, Kranovich asserts that Sergeant Quick's testimony that the grant amount was guaranteed conflicts with (1) a government exhibit that indicated the $12,775 amount was based on an estimation, and (2) a memorandum written by Quick which stated, "based upon availability of funds, these smaller jurisdictions will receive the full 50% of requested funds in approved applications." He contends that Quick "failed to provide any explanation or other evidence giving credence to this unfounded belief" that the funds were guaranteed.

**[4]** However, "we must respect the exclusive province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts, by assuming that the jury resolved all such matters in a manner which supports the verdict." *United States v. Sherwood*, 98 F.3d 402, 408 (9th Cir. 1996) (internal quotations and alterations omitted), *quoting United States v. Gillock*, 886 F.2d 220, 222 (9th Cir. 1989). Viewing this evidence in the light most favorable to the government, we conclude that a rational trier of fact could have relied on

Quick's testimony to find beyond a reasonable doubt that the County received benefits in excess of $10,000. *See Odom*, 329 F.3d at 1034. We therefore hold the County "received" the total grant amount when it was guaranteed access upon request to those funds.

IV.

Kranovich challenges his conviction pursuant to 18 U.S.C. § 641 by contending there was insufficient evidence that the Program funds he embezzled were the property of the United States. We review de novo whether property is "of the United States" for purposes of section 641. *United States v. Lawson*, 925 F.2d 1207, 1209 (9th Cir. 1991).

**[5]** Pursuant to section 641, the stolen property must be a "record, voucher, money, or thing of value *of the United States* or of any department or agency thereof." 18 U.S.C. § 641 (emphasis added). To satisfy this requirement, the United States "must have 'title to, possession of, or control over' the funds involved." *United States v. Faust*, 850 F.2d 575, 579 (9th Cir. 1988), *quoting United States v. Johnson*, 596 F.2d 842, 846 (9th Cir. 1979). In *United States v. Von Stephens*, 774 F.2d 1411, 1413 (9th Cir. 1985) (per curiam), we held that the federal government "has sufficient interest in its funds, even if commingled [with state and county funds], where it exercises supervision and control over the funds and their ultimate use." We concluded that the United States exercised sufficient control over stolen funds for purposes of section 641 — despite the fact that only forty-nine percent of the stolen funds were federal monies — because the federal government required state audits and quarterly reports, conducted on-site reviews, interviewed recipients of the funds, and examined bank accounts and employer rolls. *Id.*; *see also Faust*, 850 F.2d at 579 (holding that the federal government had substantial control over tugboats that were being built with federal funds where the financing, construction, and operation of the tugboats was governed by a security agree-

ment between the defendant and the federal government); *Johnson*, 596 F.2d at 844-46 (holding that the federal government "retain[ed] substantial supervision and control over the funds" distributed to a local agency in light of regulations on, among other things, maintaining detailed financial records, filing annual reports, and government-prescribed financial management systems).

Kranovich contends "there was no federal oversight of the funds after they were transferred to Lander County." However, the Agreement expressly provided that Program assets must be used "in accordance with [relevant] statutes and guidelines," and all requests for changes in use were to be submitted in writing to the appropriate federal agencies. Furthermore, the Sheriff's Department was required to keep the Program funds in a separate account to prevent commingling with other funds, and this account was "subject to the standard accounting requirements and practices employed for other such public monies," as well as requirements set forth in guides published by the Departments of Justice and the Treasury. Additionally, the Sheriff's Department was required to submit an Annual Certification Report, and audits were to be conducted pursuant to certain federal regulations. Failure to comply with the Agreement would subject the Sheriff's Department to sanctions.

**[6]** Thus, the nature and extent of the federal government's control over the Program funds was commensurate with controls we have previously deemed sufficient for section 641. We therefore hold there was ample evidence for a rational trier of fact to find beyond a reasonable doubt that the stolen funds were property of the United States.

## V.

We affirm the judgment of conviction. We hold the mandate, however, pending our filing of a separate memorandum disposition addressing Kranovich's challenge to his sentence.

CONVICTION AFFIRMED; MANDATE HELD.